A. Campbell KING, Jr., and wife, Mary Jane King, Appellants,

v.

UNITED STATES of America, Appellee.

No. 77–1907.

United States Court of Appeals, Fourth Circuit.

Argued June 7, 1978.

Decided Oct. 30, 1978.

Roger L. Dillard, Jr. and Kent Coward, Sylva, N. C. (Coward, Coward & Dillard, Sylva, N. C., on brief), for appellants.

Robert W. Frantz, Atty., Dept. of Justice, Washington, D. C. (James W. Moorman, Asst. Atty. Gen., Washington, D. C., Harold M. Edwards, U. S. Atty., Asheville, N. C., Jacques B. Gelin and Eva R. Datz, Atty., Dept. of Justice, Washington, D. C., William W. Bargeron, U. S. Dept. of Agriculture on brief), for appellee.

Before HAYNSWORTH, Chief Judge, RUSSELL, Circuit Judge, and HOFFMAN,* District Judge.

DONALD RUSSELL, Circuit Judge:

This is an action under § 2409a, 28 U.S.C., to quiet title to eight tracts of land claimed by the United States located in Jackson and Transylvania Counties in western North Carolina. The action was referred to a Special Master by consent of the parties. The warrant for such appointment was "that the matters in controversy in this case are complicated and complex and will involve the introduction and explanation of: detailed and intricate maps, charts and overlays". Under the terms of reference, the Special Master's "findings of fact * * * [were to] be final." The Special Master proceeded to take the testimony and to make his findings of fact and conclusions of law, as reported to the District Court. By his findings of fact and conclusions of law, he upheld the title of the Plaintiffs to five of the tracts of land in question. The Plaintiffs did not except to the Special Master's report. The Government did except. After a hearing on the Government's exceptions, the District Court vacated the Special Master's Report and directed the dismissal of the Plaintiffs' action. The Plaintiffs have appealed. We remand the action for further proceedings.

At the outset, we are hindered in our consideration of the appeal by the absence in either the Special Master's Report or the Opinion of the District Court of a clear tracing of the claimed chain of title of the Government to all or a part of the five tracts remaining in controversy. The Special Master made no such finding because he held that the Government had failed to introduce any proper chain of title under the law of North Carolina. The District Court reversed this ruling of the, Special Master and simply found that a stipulation between the parties, made during trial, constituted an agreement that a listing of the deeds in the Government's chain of title should be treated for purposes of the deci-

sion, as proper evidence of chain of title. Assuming such deeds represented a chain of title, it made no attempt to spell out this chain of title as the Special Master had done with reference to the Plaintiffs' chain of title.

Our problem at this stage is thus that the findings of neither the Special Master nor the District Court make it entirely clear just what is the Government's source of title for all of the tracts in dispute. The Government states in its brief that some of the tracts were never owned by the Grimshawe family, through whom the Plaintiffs claim, and that, so far as these tracts are concerned, the Plaintiffs are without any rights. These tracts are, however, not identified. The Special Master seems to find that the tracts which remain in dispute were the five tracts described in the exceptions set forth in the deed of Thomas Grimshawe, Jr. and his wife to M. Buchanan, to which we refer in more detail later. If this is correct, all the tracts would seem to have been included in the lands owned by Thomas Grimshawe, Sr. at the time of his death and Thomas Grimshawe, Sr. would be the common source of title for both Plaintiffs and the Government. The District Court's opinion suggests that the issue of title begins with a construction of the will of Thomas Grimshawe, Sr. This indicates that, in its analysis of the case, title to all or a part of the disputed tracts for both parties trace back to Thomas Grimshawe, Sr. For present purposes and on the record, as it presently exists, we shall treat Thomas Grimshawe, Sr. as the common source of title for the lands in dispute. This, however, is without prejudice to the right of the Government, on remand, to offer evidence of a source of title for all or a part of the land in dispute other than Thomas Grimshawe, Sr.

Under his will, Thomas Grimshawe, Sr. devised all his real estate to his two sons, Thomas Grimshawe, Jr. and Christopher Grimshawe "during the term of the natural lives of both of them, the remainder to the survivor and his heirs in fee simple, forev-

* Senior District Judge for the Eastern District of Virginia, sitting by designation.

er." On three occasions between 1897 and 1907, Christopher executed deeds in favor of his brother Thomas Grimshawe, Jr. covering lands devised to the brothers under their father's will. In the first of these, Christopher deeded "all of his interest in the lands of which their father, the late Thomas Grimshawe, Sr., died seized and possessed." In the last of these deeds, dated September 28, 1907, he conveyed to his brother Thomas Grimshawe, Jr. "all of his right, title, and interest in and to a boundary of land containing 2,000 acres, more or less, and being known as the Thomas Grimshawe, Sr., home tract." Both parties, acting on what was apparently some agreed division of the property inherited under the will of their father, also appear to have executed later a deed or contract of sale to third parties over some part of the inherited property. Thus, Christopher Grimshawe entered into an agreement on August 16, 1912, to convey to W. A. Rexford certain lands which presumably passed to the brothers under their father's will. On May 29, 1920, Thomas Grimshawe, Jr. and his wife, on the other hand, had executed a deed in favor of M. Buchanan over a tract of land, consisting of 3,206.6 acres and constituting a part of the T. Grimshawe home place with four express exceptions described by metes and bounds. It was, incidentally, these excepted tracts, i. e., the 68.4 acre tract, the 20 acre wedge shaped tract, the 138 acre triangular shaped tract, and the 42 acre triangular shaped tract, which the Special Master apparently found to be the tracts over which the Plaintiffs had title.

The final deed between the brothers and the one which provides a crucial step in the resolution of the conflicting claims of title, as considered by both the Special Master and the District Court, is a deed dated May 2, 1922 from Thomas Grimshawe, Jr. and his wife to Christopher Grimshawe. By this deed the grantors conveyed to Christopher Grimshawe their interest "in and to the certain lands which the said C. Grimshawe had agreed to convey to W. A. Rexford, pursuant to an agreement dated August 16, 1912" but excepting therefrom "the lands embraced in a boundary survey made by General Erwin and others, surveyors, on the headwaters of the Chatooga River of 4,400 acres, more or less, which includes the former home of the said T. Grimshawe in the Whiteside Cove on the waters of the Chatooga River * * * which said boundary of 4,400 acres is reserved by the said T. Grimshawe, and wife, Bessie Grimshawe, * * * for their use and benefit and for the use and benefit of their heirs and assigns."[1] In construing this deed, the Special Master found that Thomas Grimshawe, Jr. conveyed his "½ undivided interest for life" in all the property devised the two brothers by their father except for the former's interest in the 2,000 acres constituting the "home place," which Thomas Grimshawe, Jr. expressly reserved from the conveyance. The Special Master looked back to Christopher Grimshawe's two deeds to his brother, under which the former conveyed all his interest (i. e., a "½ undivided interest for life") in the 2,000 acre "home place" and found that by such deed Thomas Grimshawe, Jr. acquired Christopher's "½ undivided interest for life" in the "home place," thereby giving him the full life interest in such premises, and that, by Thomas Grimshawe, Jr.'s reservation in his deed of May 2, 1922, the latter had retained unimpaired his full life estate in the "home place," save for so much of it as he had conveyed earlier to M. Buchanan. He then

1. The Special Master summarized the reasons for the execution of this deed. Christopher Grimshawe had entered into a contract of sale of a part of the lands inherited by him and his brother from their father to Rexford. His title, however, was clouded by the earlier deeds he had executed in favor of his brother Thomas Grimshawe, Jr., in which he conveyed to the latter "all his interest" in such inherited property. By this deed of May 2, 1922, Thomas Grimshawe, Jr. was removing that cloud from Christopher's power to perform under his contract with Rexford by conveying to him a title to the land covered by their contract free of any claim by his brother. But, in so doing, Thomas Grimshawe, Jr. made clear by his exception in this deed of May 2, 1922 that he was not conveying the "home place," a substantial part of which he had previously conveyed to M. Buchanan with reservation to himself and his heirs of that part of the "home place" comprising the tracts now in controversy in this proceeding.

found that when Christopher Grimshawe died in 1934 leaving Thomas Grimshawe, Jr. surviving, "the life estate held by Thomas Grimshawe, Jr. in the 2,000 acres of land acquired under the will of Thomas Grimshawe, Sr., and by deed from Christopher Grimshawe vested into a fee simple interest in said land" in favor of Thomas Grimshawe, Jr. Based on this finding, he concluded that the Plaintiffs, tracing their title through Thomas Grimshawe, Sr., had title to the tracts excepted by Thomas Grimshawe, Jr. in his conveyance of part of the "home place" to M. Buchanan by deed dated May 29, 1920, these excepted tracts being the property now in controversy. It is from this conclusion that the Government appealed to the District Court.

In reversing the Special Master, the District Court seems to begin by agreeing with the Special Master that the issue of record title itself to the several tracts in issue, as between the parties, turned on the construction of the devise by Thomas Grimshawe, Sr. to Thomas Grimshawe, Jr. and Christopher Grimshawe and of the deed of May 2, 1922 from Thomas Grimshawe, Jr. and wife to Christopher Grimshawe. It found, as did the Special Master, that the two devisees Thomas Grimshawe, Jr. and Christopher Grimshawe under the will of Thomas Grimshawe, Sr. each took not a fee simple title but merely a one-half undivided interest for life in the property devised. The District Court, though, went beyond the Special Master to find that each devisee took a one-half life estate, with a contingent remainder in fee and that this interest was "alienable" under the law of North Carolina.[2] Following this theory, it held that, again under North Carolina law, any conveyance by one brother of his entire interest in the property devised, though sufficient merely to convey a life estate *in praesenti* if both brothers were living at the

time, would mature by operation of law or by estoppel into a conveyance of fee simple title, when and if the grantor of such conveyance became thereafter the surviving brother.[3]

In applying these principles to the facts of the case, the District Court found that the deed of May 2, 1922 from Thomas Grimshawe, Jr. and wife to Christopher Grimshawe, though appearing to convey a fee, conveyed a mere life estate to Christopher Grimshawe, but the title conveyed matured into a fee simple conveyance when later Christopher Grimshawe died, leaving Thomas Grimshawe, Jr. surviving. Under this reasoning of the District Court, any party claiming title under a deed tracing back in chain of title to the deed of 1922 from Thomas Grimshawe, Jr. and wife to Christopher Grimshawe would have acquired good fee simple title—provided the lands claimed were not within the excepting language of such deeds. The Government apparently traced its title to some, if not all, of the property in controversy to a deed from Christopher Grimshawe, executed after the deed of May 2, 1922. Such deed, under the District Court's reasoning, would have conveyed good title to the Government's predecessor in title to the property so conveyed upon Christopher's death with Thomas Grimshawe, Jr., him surviving, if, but only if, that property was not within the excepting clause in the May 2, 1922 deed. To such extent as the Government's title traces back to Christopher Grimshawe and any deed executed by him after the 1922 deed from his brother and the latter's wife, it follows that, as the District Court declared, the identification of "these excepted lands become[s] very material to any substantive determination of the lawsuit." The District Court did not seek to identify "these excepted lands" nor did the District Court find that the Special Master had.[4] It found

---

2. In support of this holding, the District Court cites *Jernigan v. Lee* (1971) 279 N.C. 341, 182 S.E.2d 351.

3. In making this ruling, the District Court relied on *Barnes v. House* (1960) 253 N.C. 444, 117 S.E.2d 265; *Morrell v. Building Management* (1954) 241 N.C. 264, 84 S.E.2d 910; *Holmes v.*

*Carr* (1913) 163 N.C. 122, 79 S.E. 413; and *Buchanan v. Harrington* (1906) 141 N.C. 39, 53 S.E. 478.

4. This conclusion by the District Court is subject to some doubt. The Special Master is perhaps not explicit but he had inferentially, at least, identified the lands conveyed by the ex-

it unnecessary to undertake such task, "since this Court has dismissed the action as being untimely."

The basis, then, for the District Court's reversal of the Special Master was not that the Government had superior title to any part of the five tracts in dispute that may have passed under the will of Thomas Grimshawe, Sr. (the District Court did not assume to decide that issue) but that the Plaintiffs had not brought their action within twelve years of the date upon which it accrued. § 2409a(f), 28 U.S.C. in resolving this issue of timeliness, and reversing the Special Master, who had found timeliness but without assigning reasons for his conclusion, the District Court held that the same rules which governed the establishment of title by adverse possession under the local law "should apply in determining whether the Plaintiffs' predecessor in interest knew or should have known of the Defendant's claim," as required under § 2409a for the maintenance of this action. It proceeded to note the North Carolina rule that, whenever one enters into possession under color of title upon a tract of land described in such title "by definite lines and boundaries" and "occupies and holds adversely a portion of the land within the bounds of his deed, by construction of law his possession is extended to the outer bounds of his deed." [5] The deed under which the Government claimed (*i. e.*, from Whitewater River Lumber Company) is said to have covered the five tracts remaining in dispute. This deed, the District Court found, represented at least color of title.[6] The District Court accepted the fact that it was bound by the Special Master's fact finding that the Government had never issued any use permits for lumbering on any of these five tracts or had asserted open dominion over them. This, however, it found was irrelevant under its view of the law, since the

Government, by occupying merely a part of the lands covered by its color of title and by issuing use permits for the cutting of timber thereon and by marking the boundaries thereof by blazing trees, had extended its adverse possession to the "outer limits" of the property described in its 1949 deed from Whitewater. It held that the Special Master had erred as a matter of law by not so concluding.

█ An essential element in this reasoning of the District Court is of course the applicability of the rule extending the assertion of a right of adverse possession to a part of lands set forth in a deed amounting to color of title to all the property described in such deed, including that not actually occupied. Such rule appears to be subject, however, to a well-recognized exception. In particular, the North Carolina cases seem to deny the applicability of the rule on which the District Court rested its finding where the titles of the contesting parties overlap. *Price v. Tomrich Corporation* (1969) 275 N.C. 385, 167 S.E.2d 766, 771, states this exception to the rule relied on by the District Judge thus: "[w]hen a portion of the boundary of a junior grant laps on a superior title 'to mature a title under the junior grant, there must be shown adverse and exclusive possession of the lappage, or the law will presume possession to be in the true owner as to all that· portion of the lappage not actually occupied by the junior claimant.'" Under this exception to the rule followed by the District Court, it would seem that adverse possession or untimeliness could not be established over any lands where the titles of thè Plaintiffs and the Government overlap unless the Government has actually "occupied" the lappage. Of course, the Government could, also, prevail, if, apart from any claim of adverse possession, it could establish superior title. This

ception in the May 2, 1922 deed as those described in the deed of Thomas Grimshawe, Jr. and wife to M. Buchanan, including both the lands conveyed to Buchanan and the lands excepted, which he apparently finds to be the lands in question.

**5.** The District Court cites to this point *Vance v. Guy* (1944) 224 N.C. 607, 31 S.E.2d 766, and *Currie v. Gilchrist* (1908) 147 N.C. 648, 61 S.E. 581.

**6.** For a definition of color of title under the law of North Carolina, see *Hensley v. Ramsey* (1973) 283 N.C. 714, 199 S.E.2d 1 at 12.

was covered in the applicable theorems stated in *Price*. And the Government seems to have recognized this, for in its answer, it alleged lappage and then asserted its superior right both on the ground that it had superior title and that it had acquired title by adverse possession.[7]

It seems conceded (though not found by the District Court) that titles as claimed by the Plaintiffs and the Government do overlap. The Government actually alleged as much and proceeded, as we have already observed, to aver that "its title to any lappages is superior to that of the plaintiffs" and that "in addition to having superior title to any lappages of land * * * [it] owns * * * such lappages by virtue of adverse possession under color of title by it and its predecessors in title."[8] The Special Master also found such overlap.[9] The District Court makes no finding to the contrary. It would appear to follow that, at least so far as the lappages in the five tracts involved in this appeal are concerned, the Government in order to prevail must either show superior title or adverse possession based on actual dominion over the lappages. Neither the Special Master nor the District Court found superior title in the Government to any part of the property in dispute where the claims of the parties overlap. They found it unnecessary to decide this issue. It was for this reason that the District Court limited its decision to the untimeliness of Plaintiffs' claims.

But, absent superior title, the Government in order to sustain its claim, could only prove untimeliness, (if untimeliness is to be treated by analogy to a claim of adverse possession, which is the rule announced by the District Court),[10] by showing actual occupancy or exercise of dominion over whatever lands in controversy were within the lappage. The Special Master appears to have found that the use permits granted by the Government and its predecessor in title did not cover any part of this lappage and, under the stipulation, that finding was "final." Whether the boundaries of the areas which overlapped had been marked by the blazing of tree markers as within the boundaries of the Government's claim is not clear from the findings of the Special Master. The Plaintiffs filed at oral argument an affidavit from the surveyor for the Government who established the boundary lines for the Government's claim of title. In this affidavit, he seems to deny any such marking of the boundaries. This affidavit was received into the record subject to the right of the Government to reply thereto. The Government did reply by citing excerpts from the surveyor's report given the Government in his survey. This is not the forum to resolve this factual conflict. That is the function of the District Court, or, if it so elects, the Special Master.

We are thus confronted in this suit over title to real estate with a record in which there is no finding by the District Court of superior title in favor of either party and where its finding of untimeliness is flawed by failure to consider to what extent the property in dispute may be lappage and what will constitute notice of claim of title in the case of lappage. Those findings are necessary to any real appellate review of the District Court's decision. It is obvious, therefore, that the cause must be remanded

---

**7.** This principle is set forth in *Price*, thus (167 S.E.2d at 771):

    " '1. Where the title deeds of two rival claimants to land lap upon each other, and neither is in the actual possession of any of the land covered by both deeds, the law adjudges the possession of the lappage to be in the one who has the better title. * * *

    " '2. If one be seated on the lappage and the other not, the possession of the whole interference is in the former. * * *

    " '3. If both have actual possession of some part of the lappage, the possession of

the true owner, by virtue of his superior title, extends to all not actually occupied by the other. * * *' "

**8.** In stating its claim in this language, the Government recognized that, as to any lappage, it could only prevail as declared in *Price*.

**9.** See findings numbered 27, *et seq.*

**10.** The Government does not object to the method of determining untimeliness under the statute by analogy to the state rule as to adverse possession.

to the District Court for additional findings. On remand, the District Court should first identify specifically the lands in dispute and the chain of title of the respective parties thereto. Assuming that Thomas Grimshawe, Sr. is the common source of title, the District Court should construe the deed of May 2, 1922, determining particularly whether the five tracts in dispute were within the excepting language of the deed from Thomas Grimshawe, Jr. and wife to Christopher Grimshawe. If, of course, it is found that Thomas Grimshawe, Sr. was not such a source for all or any part of the tracts in question, the claim of the Plaintiffs should be dismissed since their claim traces back to Thomas Grimshawe, Sr. and to the terms of his will. If the District Court, however, finds that the lands were in whole or in part included within the devise under the will of Thomas·Grimshawe, Sr. it must then, after determining whether the lands in dispute were within the exception in the deed of May 2, 1922, find whether there was a resulting overlap of the titles of the Plaintiffs and of the Government to all or any part of the property in controversy, and, if so, whether blazing of boundary markers, or otherwise, the Government or its predecessor in title had established that the Plaintiffs knew or should have known prior to 1962 of the Government's claim to such land.

In listing these issues of fact on which the District Court should make findings, we have not attempted to preclude the District Court from making other relevant findings, which it may consider appropriate to the proper resolution of the controversy. Either party should, also, be entitled on remand to introduce any additional relevant evidence, which might clarify the issues and the District Court should make findings on the basis of such additional evidence, if any.

*REMANDED WITH INSTRUCTIONS.*